Larry and Karen SPIELMAN,
Plaintiffs–Appellants,

v.

Sara C. HILDEBRAND and Don
Madsen, Defendants–Appellees.

No. 87–1098.

United States Court of Appeals,
Tenth Circuit.

May 3, 1989.

Eric Kjorlie (Ralph E. Skoog, Topeka, Kan., with him on the brief), for plaintiffs-appellants.

David D. Plinsky (Robert T. Stephan, Atty. Gen. for the State of Kan., Litigation Div., with him on the brief), Asst. Atty. Gen. for the State of Kan., for defendants-appellees.

Before McKAY, TACHA and BRORBY, Circuit Judges.

TACHA, Circuit Judge.

This appeal is from a grant of summary judgment in favor of the defendants in a case arising out of the defendants' actions as employees of the Kansas Department of Social and Rehabilitation Services. The issues on appeal are whether the plaintiffs have alleged a deprivation of federal rights sufficient to state a claim under 42 U.S.C. § 1983 and, if so, whether such rights were clearly established at the time of the deprivation, thereby divesting the defendants of qualified immunity from suit for their actions in this matter. We affirm.

## I.

"We may affirm the granting of summary judgment if any proper ground exist[s] to support the ruling." *Lindsey v. Dayton–Hudson Corp.*, 592 F.2d 1118, 1124 (10th Cir.), *cert. denied,* 444 U.S. 856, 100 S.Ct. 116, 62 L.Ed.2d 75 (1979). "In reviewing a summary judgment order, the appellate court applies the same standard employed by the trial court under Rule 56(c) of the Federal Rules of Civil Procedure." *Osgood v. State Farm Mut. Auto. Ins. Co.*, 848 F.2d 141, 143 (10th Cir.1988). Rule 56(c) requires that summary judgment be rendered if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment, and the court must review the record in the light most favorable to the opposing party." *Ewing v. Amoco Oil Co.*, 823 F.2d 1432, 1437 (10th Cir.1987).

The material facts in this case, construed in a light most favorable to the plaintiffs, are as follows. On March 9, 1981, the Kansas Department of Social and Rehabilitation Services (SRS) placed two children, a brother and sister, in the home of the plaintiffs, Larry and Karen Spielman (the Spielmans). The initial placement in the Spielman home was technically a foster care placement. The unavailability of funds to subsidize adoption apparently prevented the Spielmans from entering into a formal preadoption agreement at that time. SRS nevertheless instructed the Spielmans to treat the children as their own and considered them to be in preadoptive status. The Spielmans were aware, however, that before a formal adoption could be finalized, a trial period of several months was necessary to determine whether the children would adjust to their home.

On June 29, 1981, the Spielmans entered into formal agreements with SRS establishing a preadoptive relationship between them and each of the children. These agreements required a minimum ten month supervisory period before a consent to formal adoption would be issued. Each agreement also gave notice that "[SRS] reserves the right to cancel the agreement and to remove said child from the home ... whenever, in the opinion of [SRS]," the Spielmans failed to fulfill any of the covenants or stipulations of the agreement. Most relevant here is the stipulation that each child was to remain in their home "as long as the best interests of the child are served."

The girl bonded to the Spielmans as her parents, and also bonded to the Spielmans' natural daughter as her sister. The boy, however, had many problems adjusting to the family. Despite efforts to provide a secure environment for the boy, he did not accept the Spielmans as his adoptive parents.

In April 1982 three members of the SRS staff, including the defendant Sara Hildebrand, met with the Spielmans to review the placement of the children and to determine whether to recommend formal adoption. Although the Spielmans indicated that they were ready to adopt the girl, they were not ready to adopt the boy because of problems with his adjustment to the family. The Spielmans declined to formalize the adoption of either child at that time because of their concern for the feelings of the boy if his sister was adopted but he was rejected.

SRS therefore extended the preadoption period, leaving the children in the care of the Spielmans on the condition that they would seek family counseling to assist them in resolving the boy's difficulties. The Spielmans agreed, although they indicated that they could not participate in counseling immediately because of the time demands associated with visiting Larry Spielman's brother in the hospital and the occupational demands of farming during the spring season.

Difficulties between the boy and the family continued. On May 21, 1982, Karen Spielman called Ray Applegarth, a social worker employed by SRS, and told him that the boy wanted to leave their home. The Spielmans had had discussions with the boy concerning his desire to leave their home and attempted to persuade him to stay. Recognizing, however, that "[their] house is a home and it's not a prison," and that the boy needed professional help that they could not provide, Karen Spielman told Mr. Applegarth that they would permit the boy to leave but they wanted to keep the girl.

After receiving the phone call from Karen Spielman, Mr. Applegarth contacted his supervisor, defendant Sara Hildebrand. After a brief discussion, Ms. Hildebrand decided that both children would be removed from the home because the children were placed as a sibling pair and should be kept together. Fifteen minutes after Karen Spielman had made the call, Mr. Applegarth called back to notify her that both children would be removed. Sara Hildebrand was responsible for the decision to remove the children; she made the decision without personal contact with the children or the Spielmans, and without conducting or requesting further investigation into the special needs of the children.

The Spielmans objected to the removal of both of the children and contacted Sara Hildebrand's supervisor, defendant Don Madsen, to request an administrative hearing. Such a hearing was not held, however, and on May 26, 1982, Mr. Applegarth visited the Spielmans' home to tell them that the children would be removed the next day. When Mr. Applegarth returned the next day to remove the children, he was unable to pick up the girl because she was not at home. Mr. Applegarth took the boy and his belongings and called to inform Sara Hildebrand that the Spielmans had retained the girl.

Sara Hildebrand contacted Judge Loffswold, the Crawford County district court judge having jurisdiction over the original placement. Ms. Hildebrand informed Judge Loffswold of the Spielmans' retention of the girl and also expressed concerns

about continuation of the girl's placement. Her concerns were based, in part, on an allegedly abusive atmosphere in the home, uncooperative attitudes on the part of the Spielmans, and the agency's desire to keep natural siblings together. On the basis of these representations, Judge Loffswold issued an *ex parte* order to apprehend the girl and requested that Ms. Hildebrand produce a written summary of her statement of concerns regarding the placement, which she did.

Judge Loffswold's *ex parte* order was never enforced.[1] Mr. Applegarth went with an undersheriff to the Spielmans' home to pick up the girl pursuant to the order. The plaintiffs, however, contacted the county attorney, who then came to the Spielmans' home, met with Applegarth and the undersheriff, and told them to do nothing until a hearing could be held regarding the girl's placement.

The hearing was held before Judge Loffswold on June 1, 1982. The Spielmans received notice of the hearing and attended with counsel. This hearing afforded a full opportunity for both parties to present evidence and to cross-examine witnesses. Sara Hildebrand testified at this hearing, and the court admitted into evidence the written summary of her statement of concerns to Judge Loffswold that formed the basis of the *ex parte* order. Although the Spielmans contend that Ms. Hildebrand's written summary contained material misrepresentations, this testimony was subjected to cross-examination by their counsel. The Spielmans also presented evidence on their behalf.

After the hearing, Judge Loffswold ordered SRS to take custody of the girl, and

she was placed in temporary foster care. Although this was an appealable order, no appeal was filed. After approximately ten months of further evaluation of the children, the girl was returned to the Spielmans, and they adopted her. The boy was placed in an institutional setting for further care and was not adopted by the Spielmans.

In 1984 the Kansas Behavioral Science Regulatory Board held a hearing regarding Sara Hildebrand's conduct in the Spielman case. The Board found that Ms. Hildebrand's written statement prepared for Judge Loffswold contained untrue statements and that she had "[e]ngaged in fraudulent and/or deceitful conduct in connection with services rendered ... by her as a social worker" in connection with the Spielman case. Further, the Board found that her decision to remove the children from the Spielman home without personally contacting them and attempting to salvage the placement violated SRS policy. The Board therefore revoked Sara Hildebrand's social worker license pursuant to its authority under Kan.Stat.Ann. § 75–5356 (1984).[2] This decision was affirmed by the District Court of Shawnee County, Kansas.

The Spielmans brought this action under 42 U.S.C. § 1983 alleging a deprivation of a putative liberty interest in their familial relationship with the girl in violation of the due process clause of the fourteenth amendment. This due process violation was allegedly caused by defendant Hildebrand's failure to provide an agency hearing prior to removing the girl from their home and defendant Madson's failure as Ms. Hildebrand's supervisor to prevent the denial of such hearings. The Spielmans also sought damages under section 1983

---

1. The Spielmans have raised for the first time on appeal a theory that the *ex parte* order was enforced because they were effectively acting as "surrogate sheriffs" in transporting the girl to the hearing before Judge Loffswold on June 1, 1982. This argument finds no support in law or in the record. The Spielmans' own testimony clearly states that they did not surrender custody of the girl until after the June 1, 1982, hearing.

2. At the time of the revocation, section 75–5356 provided in relevant part:

The board may ... revoke any license issued under the provisions of this act upon proof, after a hearing, that the licensee:

. . . .

(b) Has been found guilty of fraud or deceit in connection with services rendered as a social worker ... or

. . . .

(e) Has been found guilty of negligence or wrongful actions in the performance of duties.

Kan.Stat.Ann. § 75–5356 (1984).

for the defendants' alleged deprivation of a putative federal right to a state agency hearing under section 471(a)(12) of the Adoption Assistance and Child Welfare Act of 1980 (AACWA), 42 U.S.C. § 671(a)(12).

The defendants have raised the affirmative defense of immunity. They claim that they are entitled to absolute immunity for their alleged performance of quasi-prosecutorial functions. Alternatively, they claim qualified immunity: "When government officials are performing discretionary functions, they will not be held liable for their conduct unless their actions violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 645 (10th Cir.1988) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). With regard to the merits, the defendants deny that the Spielmans possess any liberty interest claimed here and further contend that even if such interest existed, it was adequately protected by the June 1, 1982, state court hearing. The defendants deny that the AACWA provides any federal rights in this case.

## II.

A properly established affirmative defense of immunity, whether qualified or absolute, entitles a defendant to be free from the burdens of trying a lawsuit. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). An important procedural difference nevertheless distinguishes absolute from qualified immunity. "An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989 n. 13, 47 L.Ed. 2d 128 (1976). Qualified immunity, in contrast, provides protection only "insofar as [government officials'] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

The Supreme Court has generally applied a functional approach to determine whether absolute immunity applies to a defendant who is not claiming immunity based upon express constitutional or legislative provisions. *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988). "Under that approach, we examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Id.* Absolute immunity serves the important public policy goal of protecting officials performing important discretionary governmental functions from the threat of civil liability that may disrupt the decisionmaking process: "When officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct." *Id.*

Despite the perceived public benefit of better decisions by public officials, absolute immunity detracts from the "ideal of the rule of law" in particular cases. *Id.* We are therefore "cautious in recognizing claims that government officials should be free of the obligation to answer for their acts in court." *Id.* When absolute immunity to a section 1983 action is not based on express constitutional or statutory provisions, we look to the immunities available at common law to officials performing similar functions and examine the public interest behind granting immunity of that scope. *See, e.g., Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 1095–96, 89 L.Ed.2d 271 (1986); *Imbler,* 424 U.S. at 421, 96 S.Ct. at 990–91. "Officials who seek exemption from personal liability have the burden of showing that such an exemption is justified by overriding considerations of public policy, and the Court has recognized a category of 'qualified' immunity that avoids unnecessarily extending the scope of

the traditional concept of absolute immunity." *Forrester*, 108 S.Ct. at 542.

The parties do not dispute that defendant Hildebrand has absolute immunity from a civil action for any false testimony at the adversary hearing before Judge Loffswold.[3] "The immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings" is well established in the common law and further supported by the public policy of preserving the truthfinding process from distortions caused by fear of suit. *Briscoe v. LaHue*, 460 U.S. 325, 330–33, 103 S.Ct. 1108, 1113–14, 75 L.Ed.2d 96 (1983). The disputed claim of immunity here involves the defendants' contention that they are entitled to absolute prosecutorial immunity on the ground that, in deciding to remove the children from the Spielman home without providing an agency hearing, they were performing discretionary functions analogous to those of a prosecutor.

Prosecutors are entitled to absolute immunity from suits for civil damages under section 1983 when such suits are predicated upon the prosecutor's performance of functions "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430–31, 96 S.Ct. at 995–96. The common-law basis for such immunity rested upon "the same considerations that underlie the common-law immunities of judges and gran[d] jurors acting within the scope of their duties." *Id.* at 422–23, 96 S.Ct. at 991. These public policy considerations include the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* at 423, 96 S.Ct. at 991.

The scope of absolute immunity, however, extends no further than necessary to protect these public policy interests.

See *Harlow*, 457 U.S. at 811, 102 S.Ct. at 2734; *Rex v. Teeples*, 753 F.2d 840, 843 (10th Cir.), *cert. denied*, 474 U.S. 967, 106 S.Ct. 332, 88 L.Ed.2d 316 (1985). Although the Supreme Court in *Imbler* did not consider whether absolute immunity extends to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate," *Imbler*, 424 U.S. at 430–31, 96 S.Ct. at 995, this court has held that absolute immunity does not extend to a prosecutor's performance of investigative functions, *Rex*, 753 F.2d at 843. "Although identifying those acts entitled to absolute immunity is not always easy, the determinative factor is 'advocacy' because that is the prosecutor's main function and the one most akin to his quasi-judicial role." *Id.; see Meade v. Grubbs*, 841 F.2d 1512, 1532 (10th Cir.1988). We must therefore determine whether the defendants' actions in this case constituted advocacy functions sufficiently related to initiating judicial proceedings to justify absolute immunity.

Some courts have utilized the analogy to prosecutorial functions to accord absolute immunity to social workers performing the function of initiating dependency proceedings against parents suspected of child abuse. *See, e.g., Meyers v. Contra Costa County Dep't of Social Servs.*, 812 F.2d 1154, 1156–57 (9th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987); *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir.1984); *Pepper v. Alexander*, 599 F.Supp. 523, 526 (D.N.M.1984). In *Meyers*, the Ninth Circuit was careful to distinguish a social worker's activities performed as an "advocate" when "contributing to an informed judgment by an impartial decisionmaker"—which are entitled to absolute immunity—from situations in which the social worker "acted unilaterally prior to the operation of the judicial process." *Meyers*, 812 F.2d at 1157. While noting that it would be ideal for social

---

**3.** The plaintiffs apparently attempt to base their claims in part on misrepresentations in defendant Hildebrand's *ex parte* communications with Judge Loffswold. Because Judge Loffs-

wold's *ex parte* order was never enforced, the plaintiffs cannot now claim to have been harmed by that order.

workers to make decisions with "absolute freedom from the threat of unfounded lawsuits," the court nevertheless held that only qualified immunity protection is available unless the social worker's activity has the requisite connection to the judicial process. *Id.* at 1158.

The Fifth Circuit applied a similar distinction in holding that child protective service workers who removed children from their homes without a court order on the basis of suspected abuse were entitled only to qualified immunity. *Hodorowski v. Ray*, 844 F.2d 1210, 1214 (5th Cir.1988). In that case, the worker's "actions in taking possession of the children were not integral to the judicial process" and therefore were not within the scope of absolute prosecutorial immunity. *Id.; see also Austin v. Borel*, 830 F.2d 1356, 1361–63 (5th Cir.1987) (act of filing "verified complaint" that initiates state custody, but does not initiate process to adjudicate claim of child abuse, sufficiently removed from judicial phase to deny absolute prosecutorial immunity).

The defendants' nontestimonial actions that form the basis of the Spielmans' complaint are similarly "not integral to the judicial process" and therefore not entitled to absolute immunity. The defendants' performance of discretionary functions were in no way related to advocacy before a judicial body. The Spielmans' custody of the girl was based upon their preadoption agreement with the state, and the defendants' decision to remove the girl without affording the Spielmans a prior agency hearing was based upon their perceived authority to do so under that agreement. In failing to provide an agency hearing prior to the state court hearing at which such custody was removed, the defendants clearly "acted unilaterally prior to the operation of the judicial process," *Meyers*, 812 F.2d at 1157, and are therefore entitled only to raise the defense of qualified immunity. *See id.; see also Whitcomb v. Jefferson County Dep't of Social Servs.*, 685 F.Supp. 745, 746–47 (D.Colo.1987) (social workers and sheriff's deputies taking child from home without court order but on good faith belief of abuse entitled only to qualified immunity).

Once the qualified immunity defense is properly raised, a plaintiff must make a two-fold showing: first, that a defendant's conduct violated federal law; and, second, that such law was clearly established when the alleged violation occurred. *Pueblo Neighborhood Health Centers*, 847 F.2d at 646. In order to satisfy this burden, a plaintiff must do more than identify in the abstract a clearly established right and allege that a defendant has violated it. "The 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 645 (quoting *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). In this case, we find that the Spielmans have failed to carry their burden to show that the defendants' conduct violated any federal constitutional or statutory rights. We therefore need not reach whether such rights were clearly established.

### III.

The due process clause of the fourteenth amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has long recognized family relationships as one of the liberties protected by the due process clause of the fourteenth amendment. *See Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 842, 97 S.Ct. 2094, 2108, 53 L.Ed.2d 14 (1977) [hereinafter *Smith v. OFFER* ]. "There does exist a 'private realm of family life which the state cannot enter,' that has been afforded both substantive and procedural protection." *Id.* (footnote omitted) (citation omitted) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944)).

The Supreme Court has stated that when the due process clause "is invoked in a novel context, it is our practice to begin the inquiry with a determination of the precise nature of the private interest that is threatened by the State." *Lehr v. Robertson*,

463 U.S. 248, 256, 103 S.Ct. 2985, 2990, 77 L.Ed.2d 614 (1983). Such a novel context is presented in this case, as the constitutional status of preadoptive familial relationships is an issue of first impression.

Preadoptive parents have not yet attained the status of adoptive parents, who like natural parents, have a protected liberty interest in their familial relationships with their children. *See Smith v. OFFER*, 431 U.S. at 844 n. 51, 97 S.Ct. at 2109 n. 51. On the other hand, the status of preadoption may be viewed as conferring a more significant relationship than foster care because of the possibility of developing a permanent adoptive relationship. The Supreme Court has made clear that neither biological nor adoptive ties are essential for developing a protected family relationship:

> [T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children, *Wisconsin v. Yoder*, 406 U.S. 205, 231–233, 92 S.Ct. 1526, 1541–1542, 32 L.Ed.2d 15 (1972), as well as from the fact of blood relationship. No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship.

*Smith v. OFFER*, 431 U.S. at 844, 97 S.Ct. at 2109–10. On this basis, the Supreme Court noted in dicta the possibility of a protected relationship arising between foster parents and a child placed as an infant who has remained for several years and has never known his real parents. *Id.*

Although emotional ties between children and unrelated adults may give rise to a constitutionally protected liberty interest, such an interest is limited by state law when the requisite emotional ties "have their origins in an arrangement in which the State has been a partner from the outset." *Id.* at 845, 97 S.Ct. at 2110. When "the claimed interest derives from a knowingly assumed contractual relation with the State, it is appropriate to ascertain from state law the expectations and entitlements of the parties." *Id.* at 845–46, 97 S.Ct. at 2110. The preadoptive relationship between the Spielmans and the girl in this case clearly arises from just such a contractual relationship. We must therefore examine the Spielmans' legitimate expectations regarding their continued relationship with the girl as a result of their agreement with SRS.

The preadoption agreement in this case differs significantly from a typical foster care placement agreement because a preadoption placement represents an attempt to find a permanent, stable home for children. Foster care agreements, in contrast, typically involve temporary care during a transitional period of a child's life, and for this reason some courts have refused to accord constitutional protection to foster family relationships. *See, e.g., Kyees v. County Dep't of Public Welfare*, 600 F.2d 693, 698–99 (7th Cir.1979) (per curiam); *Drummond v. Fulton County Dep't of Family & Children's Servs.*, 563 F.2d 1200, 1206, 1208 (5th Cir.1977) (en banc), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978). *But see Rivera v. Marcus*, 696 F.2d 1016, 1024–25 (2d Cir.1982) (foster parent had protected interest when related to children as half sister).

Foster care relationships also often present the problem of tension between any liberty interests of foster parents and competing interests of natural parents who may have temporarily surrendered custody of the child to the state with the express understanding that the child would be returned to them. *See Smith v. OFFER*, 431 U.S. at 846, 97 S.Ct. at 2110–11. Such is not the case here, as the rights of the natural parents have been terminated, and the purpose of the placement was to establish a permanent family relationship if possible.

In this case, the SRS' right to remove the children was restricted by the written preadoption agreement to circumstances in which the preadoptive parents

failed to fulfill specified requirements [4] or in which the placement no longer served the best interests of the child. The Spielmans were informed that there would be a trial period of several months before adoption could be formalized, but nevertheless were encouraged to treat the children as their own and to raise them as they would raise their own children. The preadoption agreement, coupled with the SRS representations at the time the children were placed with the Spielmans, may have given the Spielmans a reasonable expectation of developing a permanent relationship with the child that rises to a liberty interest meriting limited due process protection. Assuming, without deciding, that the preadoptive status of the relationship at issue here is a sufficient liberty interest to afford the Spielmans some level of due process protection, we nevertheless hold that because the Spielmans received a hearing, any such constitutional right was not violated by the defendants' conduct.

The threshold inquiry in evaluating the qualified immunity defense in a section 1983 action is whether any federal right has been violated at all. "Where procedural due process must be afforded because a 'liberty' or 'property' interest is within the Fourteenth Amendment's protection, there must be determined 'what process is due' in the particular context." *Id.* at 847, 97 S.Ct. at 2111. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed. 2d 62 (1965)). For this reason, some kind of hearing is generally required before a person is deprived of a protected interest, "'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Smith v. OF-*

*FER,* 431 U.S. at 848, 97 S.Ct. at 2111–12 (quoting *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 570 n. 7, 92 S.Ct. 2701, 2705 n. 7, 33 L.Ed.2d 548 (1972)).

The Spielmans were afforded a full hearing in state court prior to losing custody of the girl. They were notified of this hearing and attended with counsel. They had the opportunity to present evidence and to cross-examine opposing witnesses. The state judge's decision was appealable, if they were dissatisfied with the result, but they failed to exercise this right. Although Judge Loffswold had been exposed to evidence concerning the case prior to the adversary hearing, such exposure "'is insufficient in itself to impugn the fairness' of [the] later adversary hearing," *Mangels v. Pena,* 789 F.2d 836, 838 (10th Cir.1986) (quoting *Withrow v. Larkin,* 421 U.S. 35, 55, 95 S.Ct. 1456, 1468, 43 L.Ed.2d 712 (1975)). The honesty and integrity of a tribunal are presumed, and the Spielmans have failed to show any countervailing reason to support a claim that the decisionmaker was biased. *See id.*

The Spielmans were clearly accorded an opportunity to be heard in a meaningful manner prior to deprivation of any liberty interest. Even assuming that state law or SRS regulations required some kind of agency hearing prior to removing preadoptive children from the custody of their preadoptive parents, the Spielmans have failed to allege a constitutional deprivation: "A failure to comply with state or local procedural requirements does not necessarily constitute a denial of due process; the alleged violation must result in a procedure which itself falls short of standards derived from the Due Process Clause." *Id.* The standards of the due process clause were clearly met by the judicial hearing in this case.

4. In the preadoption agreement, the Spielmans agreed "to receive said child as a member of [their] family; to educate said child insofar as the child may benefit thereby; to provide adequate food, medical care, and clothing for said child and to notify [SRS] immediately of any

change of address or serious illness of said child." SRS explicitly reserved the rights to determine when these covenants were not being faithfully executed and, in such an event, to cancel the agreement.

## IV.

■ The Spielmans also seek damages under section 1983 for alleged deprivation of federal statutory rights. As with the constitutional claim, the defendants are entitled to qualified immunity unless the Spielmans can show the deprivation of a clearly established right. Although the precise statutory basis for their claim is unclear, we understand their argument to rest upon section 471(a)(12) of the AACWA, 42 U.S.C. § 671(a)(12). Section 671(a) provides in relevant part:

> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—
>
> . . . .
>
> (12) provides for granting an opportunity for a fair hearing before the State agency to any individual whose claim for benefits available pursuant to this part is denied or is not acted upon with reasonable promptness. . . .

42 U.S.C. § 671(a). The Spielmans apparently contend that this statute confers upon them a substantive right to a hearing before a state agency. We disagree.

There is considerable doubt whether the AACWA confers any substantive rights that can be the subject of an action for damages under section 1983. Section 1983 does not provide a remedy if federal law does not create enforceable rights. *See Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981). "An enforceable right is created 'when Congress mandates, rather than merely encourages, a specified entitlement.'" *Scrivner v. Andrews*, 816 F.2d 261, 263 (6th Cir.1987) (quoting *Keaukaha–Panaewa Community Ass'n v. Hawaiian Homes Comm'n*, 739 F.2d 1467, 1471 (9th Cir.1984)). Such a mandate is questionable under the AACWA, which was enacted to "provide the states with fiscal incentives to encourage a more active and systematic monitoring of children in the foster care system." *Vermont Dep't of Social & Rehabilitation Servs. v. United States Dep't of Health & Human Servs.*, 798 F.2d 57, 59 (2d Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987); *see Lesher v. Lavrich*, 784 F.2d 193, 197–98 (6th Cir.1986) (holding damages claim not available in section 1983 action brought under AACWA); *In re Scott County Master Docket*, 672 F.Supp. 1152, 1174 (D.Minn.1987) (holding AACWA specifies "certain procedures" for state agencies but does "not bear upon plaintiffs' claimed liberty interest"), *aff'd sub nom. Myers v. Scott County*, 868 F.2d 1017 (8th Cir.1989). *But see L.J. by and through Darr v. Massinga*, 838 F.2d 118, 123 (4th Cir.1988) (AACWA spells out "standard of conduct" that plaintiffs may enforce by equity or damages), *cert. denied*, — U.S. ——, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989); *Lynch v. Dukakis*, 719 F.2d 504, 512 (1st Cir.1983) (holding AACWA can support private action for prospective injunctive relief). The Act requires a state to satisfy certain minimum requirements as a condition for federal funding, but otherwise affords a state "considerable flexibility in unilaterally developing administrative procedures compatible with its own unique foster care circumstances." *Scrivner*, 816 F.2d at 263.

We need not decide whether an action for damages is generally unavailable under the AACWA, however, because we find that the specific provision at issue here does not confer any federal right upon the Spielmans. The statute on its face applies only to a person whose claim for "benefits" available under the Act has been denied. *See* 42 U.S.C. § 671(a)(12). The Spielmans have neither claimed that they were denied adoption assistance payments nor shown any other provision granting them a "benefit" that was denied.

■ Furthermore, even if a state agency hearing was such a benefit, a hearing before a state court substantially fulfills such a requirement. The agency hearing requirement of section 671(a)(12) is a minimum standard necessary to receive federal funding, and the Spielmans have failed to show why a full state court hearing does not satisfy that minimum requirement.

## V.

We hold that the defendants' nontestimonial actions which form the basis of the

Spielmans' complaint are not entitled to absolute immunity from civil suit under section 1983. The defendants are therefore entitled only to raise the defense of qualified immunity. The plaintiffs, however, have failed to carry their burden of showing that the defendants' conduct violated any federal constitutional or statutory rights. The state court hearing received by the Spielmans was sufficient to meet their procedural due process claims.

The district court's grant of summary judgment in favor of the defendants is therefore AFFIRMED.