Timothy A. FRANZ and Ashley M. Franz, a minor by and through her next friend and natural guardian, Timothy A. Franz and Katherine A. Franz, Plaintiffs–Appellees,

v.

Richard LYTLE, Defendant–Appellant,

and

Jeanette Schlabach, Defendant.

No. 92–3183.

United States Court of Appeals, Tenth Circuit.

June 29, 1993.

J. Steven Pigg, Fisher, Patterson, Sayler & Smith, Topeka, KS, for defendant-appellant.

James S. Phillips, Jr., Phillips & Phillips, Chartered, Wichita, KS, for plaintiffs-appellees.

Before MOORE, McWILLIAMS, and WOOD,* Circuit Judges.

JOHN P. MOORE, Circuit Judge.

Richard Lytle, an officer with the Haysville, Kansas Police Department, appeals the denial of his motion for summary judgment based on his qualified immunity from plaintiffs' suit alleging violations of their Fourth and Fourteenth Amendment rights. *Franz v. Lytle*, 791 F.Supp. 827 (D.Kan.1992). On appeal, Officer Lytle contends the district court erred in distinguishing his conduct as a police officer investigating a report of possible child neglect or abuse from that of a social worker performing the same function

---

* The Honorable Harlington Wood, Jr., Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation.

but for whom the probable cause or warrant requirement has been eliminated. Against the societal imperative to protect children, particularly young children suspected of being victims of neglect or abuse, plaintiffs' interests in privacy must yield, Officer Lytle maintains. It is, however, because of our deep concern for the safety and well-being of young children that we disagree and, under the circumstances of this case, do not balkanize the Fourth Amendment as recommended. We affirm the district court's judgment.

## I.

The following facts, set forth in the district court's opinion and viewed in a light most favorable to the nonmoving parties, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), were presented for our plenary review. On October 19, 1988, police dispatch contacted Officer Lytle to investigate a report of a child who was possibly in need of care. That report had been called in by Ms. Susan Brickley,[1] who told police her neighbors' two-year-old daughter, Ashley Franz, was unsupervised, wet, and unclean. Late that afternoon, Officer Lytle went to Ms. Brickley's home where Ashley was playing. Ms. Brickley told Officer Lytle Ashley had a severe diaper rash and stank from constantly being urine-soaked. Without contacting Ashley's mother, Officer Lytle asked Ms. Brickley to remove Ashley's diaper. Ms. Brickley laid Ashley down on the living room floor and removed her diaper permitting Officer Lytle to observe the child's vaginal area and take five or six photographs of what he believed was a "very severe rash." Officer Lytle then visited the home of Katherine and Timothy Franz, Ashley's parents, telling Mrs. Franz he had just examined Ashley, and she would be contacted by Social and Rehabilitative Services (SRS).

Upon returning to headquarters, Officer Lytle contacted SRS, filled out a standard Kansas Bureau of Investigation (KBI) report, and consulted with Capt. Gary Johnson. According to Capt. Johnson's report, Officer Lytle told Capt. Johnson he was investigating "a possible molesting case," was concerned about "leaving the children at the home because of the risk factor that if there was a molestation case," and "was shown the bruising of the vaginal area by the female caller." Capt. Johnson advised Officer Lytle he might want to take the child for a medical examination so that a doctor could determine what caused the bruising and "alleviate the problem of protective custody." Capt. Johnson also suggested Officer Lytle have a female officer accompany him when he returned to the house.

Late the following afternoon, after telephoning a former neighbor of the Franzes,[2] Officer Lytle, accompanied by Officer Jeanette Schlabach, returned to the Franz home and requested to see Ashley again. Both officers were in uniform and carrying side arms. Mrs. Franz permitted them to enter her home and complied with their request to examine Ashley, removing her pants, laying her down on the floor, and spreading her legs apart as ordered.[3] Kneeling over Ashley, Officer Lytle then touched her vaginal area in several places "checking for any soreness or swelling," and Ashley's reaction to his touch, asking her if the places he pressed hurt.[4] Officer Lytle believed he saw some discoloration in the area.

In response to Mrs. Franz's explanation she had been trying to "potty train" Ashley, Officer Lytle asked her to "voluntarily take her up to Wesley [Hospital] ER and let the Doctor look at her." To her protests about the cost and her lack of transportation, Officer Lytle answered he could place Ashley in protective custody and "take her up there ourselves." Upset, Mrs. Franz telephoned

---

1. Ms. Brickley initially called Kansas Social and Rehabilitative Services (SRS), which told her to call the police because it did not have a caseworker available.

2. Officer Lytle called Paula Lassiter, Katherine Franz's cousin, who also stated Ashley was unsupervised and always urine-soaked.

3. Because he turned on his tape recorder, this second encounter is transcribed in the record although only Officer Lytle's words are recorded.

4. In his deposition, Officer Lytle stated, "I was just checking to see if it was tender. I was not checking for anything in particular."

her husband at work. Officer Lytle took the phone and told Mr. Franz he had received a report from SRS, checked it out, and "Ashley does have some type of discoloration, bruises, whatever it is on her legs and around her vaginal area and we need to have it checked." Officer Lytle told Timothy Franz he could either take the child voluntarily, or they would take Ashley into protective custody.

Mr. Franz returned home, and he and Mrs. Franz, escorted by the officers, drove to Wesley Hospital where Ashley was examined by an emergency room physician.[5] Mrs. Franz and the officers remained in the examining room while Dr. Davidson examined the child, concluding Ashley had "mild redness to labial folds, no tears, bruising, or edema." The officers apologized, and the Franzes returned home.

## II.

Surviving in this appeal are plaintiffs' Fourth Amendment and pendent state law claims based on invasion of privacy, trespass, and deprivation of liberty on which the district court denied defendant's qualified immunity defense.[6] To reach this result, the district court tethered summary judgment review to *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), and framed its crucial inquiry as "whether, at the time defendants acted, it was clearly established law that a child abuse investigation conducted by police officers is subject to the probable cause or warrant requirements." 791 F.Supp. at 830. Cognizant of a seeming split in the Circuits over this issue, the district court drew a bright line between law enforcement officers trained and "expected to know the subtleties of the probable cause and warrant requirements," *id.* at 831, and

social workers who "have no such fluency of the legal standards." *Id.* The court found at all times defendant was conducting a criminal investigation involving searches "aimed at uncovering incriminating evidence of sexual abuse by one or both of the parents." *Id.* This conduct, the court held, was circumscribed by the Fourth Amendment which "clearly prohibited police officers from conducting warrantless searches of a home and a child's body for evidence of criminal sexual abuse absent consent or exigent circumstances or any of the recognized exceptions to the warrant requirement." *Id.* at 831–32. Adding the *Anderson v. Creighton* prong to its analysis, the court further concluded no reasonable officer acting on the sole information provided, that Ashley was wet, unclean, and unsupervised, would "have believed that the searches were lawful."[7]

## III.

Acknowledging this court has not yet addressed the issue, defendant advocates we accord police officers investigating a complaint a child is in need of care or abused the same latitude to search he claims is granted social workers. Defendant asserts there is a split in the Circuits on this issue underscoring at the time of his actions there was no clearly established law on the visual inspection of children for child abuse or neglect investigations. Furthermore, he argues, given his statutory responsibility to cooperate with SRS "in taking action which is necessary to protect the child regardless of which party conducted the initial investigation," Kan.Stat.Ann. § 38–1523(f), defendant's conduct, though possibly in conflict with constitutionally permissible norms in other areas, was objectively reasonable. Although his actions might have led to a criminal prosecu-

5. The intake report stated the reason for admission as possible sexual assault with the comment, "police alleged sexual assult [sic] mom offers conflicting report."

6. Because plaintiffs voluntarily dismissed their suit against Officer Schlabach, Officer Lytle is the only defendant involved in this appeal; and plaintiffs do not challenge the district court's granting defendant qualified immunity on their allegations of violations of their Fourteenth

Amendment rights to familial integrity without due process of law and interference with property.

7. The court also stated that even if these circumstances created a basis for probable cause, defendant indicated no exigency preventing them from securing a warrant, nor could defendants reasonably believe plaintiffs gave consent to the searches.

tion, defendant maintains the district court erred in failing to circumscribe them by his primary concern for the safety of a young child.

We must begin with the fundamental recollection that underlying each qualified immunity claim is a construct of boundaries designed to determine whether official action taken in some form is indeed lawful. Those boundaries, enunciated in *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738, are "clearly established statutory or constitutional rights of which a reasonable person would have known." To the wide open space left within this confine, *Anderson* offered further demarcation:

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified.... But if the test of "clearly established law" were to be applied at this level of generality [the right to due process of law], it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.... It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence *more relevant*, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent.

483 U.S. at 639–40, 107 S.Ct. at 3039–40 (1987) (emphasis added) (citations omitted). *Anderson*, like our case involving allegations of a warrantless search without probable cause or exigent circumstances, added:

> It follows from what we have said that the determination whether it was objectively legally reasonable to conclude that a

given search was supported by probable cause or exigent circumstances will often require *examination of the information possessed* by the searching officials.... The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed [defendant's] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. [Defendant's] subjective beliefs about the search are irrelevant.

*Id.* at 641, 107 S.Ct. at 3040 (emphasis added).

■ Synthesizing *Harlow* and *Anderson*, we must then decide to sustain a claim of the lawful exercise of authority based on qualified immunity if, upon examining the information defendant possessed, we can conclude a reasonable officer in the same position in 1988, schooled in the governing principles of the Fourth Amendment, believed he was acting in accord with those principles. If so, his conduct was lawful, and he is entitled to qualified immunity. Precise factual correspondence to a decided case is unnecessary in making the ultimate determination. *Hidahl v. Gilpin County Dept. of Social Servs.*, 938 F.2d 1150, 1155 (10th Cir.1991).

### IV.

■ The boundary for defendant's conduct establishing the "contours of the right" involved is the Fourth Amendment, which proscribes *unreasonable* searches. *Anderson*, 483 U.S. at 639–40, 107 S.Ct. at 3038–39. In 1988, the case law had unimpeachably established " 'the cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *California v. Acevedo*, —— U.S. ——, ——, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnote omitted)). Over the years, the case law has equally established

the reasonableness component for a full-scale search is supplied by a showing of probable cause, the belief that the information possessed reveals that a crime has been committed, and evidence of that crime will be found in the place to be searched. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). While the presence of probable cause permits the issuance of a search warrant by a neutral magistrate, its absence can only be overcome by the well-delineated exceptions of consent, *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973); exigent circumstances, *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290; and administrative searches. *Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

Given these well-established principles, it became "hornbook law" to the district court that "police officers are required to conduct searches that comport with the Fourth Amendment." 791 F.Supp. at 831. Throughout the course of events, the court observed, defendant proceeded as a law enforcement officer conducting a criminal investigation of possible child abuse or neglect for which he undertook the warrantless searches. Under these circumstances, the court believed, defendant's conduct was clearly circumscribed by the warrant or probable cause requirement. Implicit in this conclusion was the court's rejection of defendant's attempt to align his conduct with that of social workers under similar circumstances.

Nevertheless, defendant continues to argue the warrantless searches at issue fall more properly within the administrative search exception. In doing so, defendant casts this case as one of first impression requiring we decide, in effect, whether social workers are relieved of the probable cause or warrant requirement when investigating cases of child abuse or neglect in order to make him ultimately the beneficiary of that analysis.[8]

■ In crafting a separate analysis for deciding the legality of administrative searches based on "the longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance," *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989) (citing *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 618–624, 109 S.Ct. 1402, 1414–17, 103 L.Ed.2d 639 (1989)), the Court has developed a balancing test. "[O]ur cases establish that where a Fourth Amendment intrusion serves special governmental needs, *beyond the normal need for law enforcement,* it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." 489 U.S. at 665–66, 109 S.Ct. at 1390–91 (citing *Skinner,* 489 U.S. at 619–20, 109 S.Ct. at 1414–15 (emphasis added)).

Taking a cue from this authority, defendant argues his state statutory responsibility to report child abuse or neglect cases, Kan. Stat.Ann. § 38–1518, as well as the state mandate for law enforcement to cooperate with SRS, Kan.Stat.Ann. § 38–1523, must be superimposed upon the 'special governmental need' side of the balance to tip it in favor of his warrantless searches. Upon this scale, he maintains, society's interest in protecting young children from abuse and neglect provides the probable cause component assuring the reasonableness of the search. Defendant relies on *Darryl H. v. Coler,* 801 F.2d 893 (7th Cir.1986), and *Landstrom v. Illinois Dept. of Children & Family Servs.,* 892 F.2d 670 (7th Cir.1990). However, neither case supports his argument.

8. Although this issue was also raised in *Snell v. Tunnell,* 920 F.2d 673, 697 (10th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991), we did not reach it, stating, "We do not have an occasion to decide whether a search of a private home [in a child abuse investigation] without a warrant or probable cause violates the Fourth Amendment." In *Snell,* social workers searched a home and removed children from the home with a warrant obtained by providing false information to the judge.

In *Darryl H.*, the Seventh Circuit's review was postured to decide whether, in one of the consolidated cases,[9] the district court abused its discretion in refusing to grant a preliminary injunction prohibiting the use of an Illinois Department of Children and Family Services (DCFS) procedure permitting caseworkers to conduct a physical examination of a child's body for evidence of abuse. Although the plaintiffs challenged the policy on various constitutional grounds, the Seventh Circuit emphasized its opinion, "at very preliminary stages of the litigation process," would not "accomplish a definitive reconciliation of these competing constitutional value concerns."[10] *Id.* at 895.

In the second consolidated case, the court affirmed the grant of summary judgment in favor of state welfare officials on the grounds plaintiffs sought retrospective money damages barred by the Eleventh Amendment, and because the court had not yet decided the constitutionality of the challenged procedure, "without a more fully developed record, we can hardly maintain that the individual defendants should have known that their efforts to fulfill their public responsibilities violated a clearly established constitutional right." *Id.* at 908.[11]

However, within the confine of preliminary injunction review, the Seventh Circuit agreed "the visual inspection conducted by governmental officials of those parts of the human body usually covered by clothing implicates fourth amendment concerns," *id.* at 900, but believed the analysis of whether the searches were reasonable was more properly addressed by the precedent of administrative searches, in particular *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (school administrator's search of student's purse reasonable on the ground "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject," *id.* at 340, 105 S.Ct. at 742 and a warrant requirement "would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools." *Id.*). Just as school officials' efforts to enforce school discipline might be hampered by careful adherence to Fourth Amendment strictures, so too would DCFS caseworkers be hindered in their investigations of alleged child abuse by a warrant or probable cause requirement. The bright line, in this case, however, was the substitution of specific "hot-line criteria" found in the DCFS *Child Abuse and Neglect Investigation Decisions Handbook* (the *Handbook* ), which, the court agreed, circumscribed the caseworker's discretion.[12] 801 F.2d at 901.

In the Seventh Circuit's view, therefore, the *Handbook* procedure for caseworkers in-

---

**9.** In one case, for example, a DCFS caseworker received an anonymous report a ten-year-old boy was beaten by his father. The caseworker spoke to the boy's school principal and then asked the boy to remove his pants so that he could examine the child's back and buttocks. *Darryl H. v. Coler*, 801 F.2d 893, 897 (7th Cir.1986).

**10.** The constitutional values plaintiffs alleged were "the privacy rights of the child; the privacy rights of the family in the important area of childrearing; and the obligation and right of responsible government to deal effectively with the stark reality of child abuse in our society, a problem the seriousness of which has only been appreciated fully in recent times and in which the methods of identification and prevention must still be termed developmental." *Darryl H.*, 801 F.2d at 895 (footnote omitted).

**11.** In a later case, *Landstrom v. Illinois Dept. of Children & Family Servs.*, 892 F.2d 670, 677 (7th Cir.1990), the court stated, "What *Darryl H.* did not do ... is set out a 'factual roadmap of constitutionally violative conduct against which defendants here could have measured their own proposed course of conduct.' " (citation omitted).

**12.** The hot-line criteria which constituted a report requiring further investigation by a DCFS caseworker was information that:

(1) a child less than eighteen years old is involved;
(2) the child was either harmed or in danger of harm;
(3) a specific incident of abuse is identified;
(4) a parent, caretaker, sibling or babysitter is the alleged perpetrator of neglect; or
(5) a parent, caretaker, adult family member, adult individual residing in the child's home, parent's paramour, sibling or babysitter is the alleged perpetrator of abuse.

*Darryl H.*, 801 F.2d at 895. Another check on a caseworker's discretion was "the child's ability to refuse to cooperate at any time," *id.* at 901, to assure a search is reasonable. Presumably, this would only apply to an older child involved in an investigation.

corporated the state's "extraordinarily weighty" interest in the protection of children[13] by focusing primarily on "the safety of the child, and the stabilization of the home environment." *Id.* at 902. Only as a contingency of secondary importance for the caseworker, in the court's reading, was the possibility of a criminal prosecution. While the court concluded "[u]nder these circumstances, we cannot say that the Constitution requires that a visual inspection of the body of a child who may have been the victim of child abuse can only be undertaken when the standards of probable cause or a warrant are met," it underscored meeting the hot-line criteria curbed the caseworker's discretion and "ensured the reasonableness of the search." *Id.* at 903. Nevertheless, constrained by the standard of review for injunctive relief, the Seventh Circuit cautioned it was not certain "the *Handbook*, as it now exists, ensures that the searches will always be reasonable." *Id.* at 904.

In *Landstrom*, plaintiffs contended "'school civil rights law' and '14th amendment rights . . . in a school/student/official controversy' were 'well established in the law' by the time of the actions alleged. . . ." 892 F.2d at 675. The factual basis for the alleged violations was the visual inspection of plaintiffs' six-year-old daughter by a school nurse and state social services worker when the child complained of "soreness . . . in her anatomy in her rear end"; *id.* at 671, and the principal's subsequent questioning of her older sister about the incident after the children's father told the school principal not to "allow similar conduct in the future." *Id.* at 672. After the caseworker, principal, and school nurse again questioned the child without the parents or their attorney present, the parents filed suit under § 1983. The Seventh Circuit rejected plaintiffs' arguments to reverse the granting of qualified immunity to the defendant caseworker and school personnel. The court distinguished authority upon which plaintiffs relied, *Picha v. Wielgos*, 410

F.Supp. 1214 (N.D.Ill.1976), because "the context differed . . . the school officials there were acting as investigative agents of the police," 892 F.2d at 677, and on the grounds of the school policy concerns echoed in *New Jersey v. T.L.O.* Finding no relevant, clearly established legal norm on the issue evidenced by the split in the Circuits, the court affirmed the grant of qualified immunity.

The distinguishing facts in each of these cases, however, cannot be metamorphosed or overcome by defendant. In particular, both cases involved state social service caseworkers, often in consultation with school personnel, individuals who deal with children regularly in their professional settings. As such, they relied on the training of their professional disciplines, in particular, the social services policy/procedure manual, to respond to specific allegations of the possibility of abuse. In each case, the probable cause component satisfied the governing standards for social workers and remained within the appropriate responses permitted by those standards. While each of these cases involved visual inspection of normally clothed portions of a child's body, none involved photographing or touching the child's nude body.

Moreover, as noted, the "special governmental needs, beyond the normal need for law enforcement," 489 U.S. at 665–66, 109 S.Ct. at 1390 for example, as facially articulated in the *Handbook*, provided the reasonableness component for the caseworker's conduct. It also offered guidance on whether the search was justified at its inception and "reasonably related in scope to the circumstances which justified the interference in the first place." *New Jersey v. T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 742 (citing *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). In *Darryl H.*, although the guidelines might not survive later scrutiny on the merits, at this stage, the searches conformed to their standards and could not then be judged unreasonable.

---

**13.** The Seventh Circuit was cognizant of the complexity of child abuse investigations: the fear of disrupting family relations through interrogations and the problems associated with "widespread inquiries of extra-familial sources, a technique bound to leave some stigma even when the subject of the investigation is entirely exonerated." 801 F.2d at 902. The court also recounted while DCFS labeled 60% of the reports of child abuse unfounded, in 1982, 71 children died in Illinois as a result of child abuse.

However, to permit defendant to benefit from these critical distinctions by heralding the primacy of the protection of children cannot be supported by the circumstances of this case. What the district court perceived, and what cannot be overlooked, is that defendant's focus was not so much on the child as it was on the potential criminal culpability of her parents. That focus is the hallmark of a criminal investigation. In contrast, a social worker's principal focus is the welfare of the child. While a criminal prosecution may emanate from the social worker's activity, that prospect is not a part of the social worker's cachet. This distinction of focus justifies a more liberal view of the amount of probable cause that would support an administrative search.

Moreover, defendant's conduct cannot otherwise be transformed into that of a social worker given the uncontroverted facts he was in uniform and carrying a gun at all times;[14] he recorded his meeting with Mrs. Franz, following police policy;[15] he filed standard KBI reports of his investigation; and he informed his superior officer he was investigating a possible child molestation. Each of these facts, as the district court properly found, provides the script for a criminal investigation carried out by a law enforcement officer.

By contrast, the social workers, for example, in *Darryl H.*, exercised only that discretion defined by the *Handbook* to assure the court they had satisfied a showing of probable cause. In the present case, defendant, armed only with information the child was urine-soaked and unsupervised, indeed told only by Ms. Brickley that Ashley had a diaper rash, and without any medical expertise, proceeded to visually inspect and touch portions of the child's body which are normally clothed. Additionally, defendant told plaintiffs if they did not comply with his order, the child would be taken into protective custody. The Kansas Code for Care of Children, relied

on by defendant, specifically requires a law enforcement officer have a court order or believe a court order has been issued unless "the officer has *probable cause* to believe that the child is a child in need of care and that there are *reasonable grounds* to believe that the circumstances or condition of the child is such that continuing in the place or residence in which the child has been found or in the care and custody of the person who has care or custody of the child would be harmful to the child." Kan.Stat.Ann. § 38–1527(b) (emphasis added).[16]

Since defendant's conduct does not comply even with the governing principles required of social workers in Kansas, we must circumscribe his actions by the governing principles of the discipline he represented. As the district court found, the Fourth Amendment draws a bright line around these facts, not as refined to address the concerns of an administrative setting like the school search in *T.L.O. v. New Jersey*, but in its application to a criminal setting in which only a showing of probable cause, absent consent or exigency, can establish the reasonableness of the search.

This analysis is also consistent with our case law which has looked to the function the official performs to examine qualified immunity claims. " 'Under that approach, we examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions.' " *Spielman v. Hildebrand,* 873 F.2d 1377, 1381 (quoting *Forrester v. White,* 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988)).

However, as the district court stated, this conclusion "does not end the inquiry," 791 F.Supp. at 832, but requires we move on to consider "whether a reasonable officer could

14. We would note Kan.Stat.Ann. § 38–1523(g) provides in part: "To the extent that safety and practical considerations allow, law enforcement officers on school premises for the purpose of investigating a report of suspected child abuse or neglect shall not be in uniform."

15. In his deposition, defendant stated he was once disciplined for failing to use his tape recorder.

16. Defendant did not allege nor did the court find exigent circumstances to justify the second search.

have believed [defendant's] warrantless search to be lawful, in light of the clearly established law and the information the searching officer possessed." *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3040. At no time, defendant stated in his deposition, was he investigating a sexual assault. The only information defendant possessed was that Ashley had a severe rash. Because defendant does not challenge the court's failure to find as a matter of law plaintiffs voluntarily consented to the searches under all of the circumstances of this case and does not allege any exigency, we agree with the district court in denying defendant qualified immunity that no reasonable officer would consider the searches lawful.[17]

Instead, this case is more akin to *Good v. Dauphin County Social Servs.*, 891 F.2d 1087 (3d Cir.1989), where the court denied defendant police officers qualified immunity for entering an apartment late at night to investigate an anonymous tip received the day before that plaintiff's child was the victim of abuse. Upon demanding entry into the apartment, although plaintiff objected and was told no warrant was necessary, the officers "with no indication that the [seven-year-old] child was injured ... stripped and inspected [her] body, ostensibly for marks or injuries. No injuries were found." *Id.* at 1090. In denying qualified immunity, the Third Circuit rejected defendants' equating the investigation of a possible victim of child abuse with an exigent circumstance absent evidence of "reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat." *Id.* at 1094. The court also rejected defendants' attempt to create an exception based on the paucity of case law decided on warrantless searches in child abuse investigations. "The Fourth Amend-

ment caselaw has been developed in a myriad of situations involving very serious threats to individuals and society, and we find no suggestion there that the governing principles should vary depending on the court's assessment of the gravity of the societal risk involved." *Id.* (footnote omitted). In addition, the court similarly distinguished *Darryl H.*, observing "defendants in the instant case do not contend that their actions were taken pursuant to any established guidelines that had been provided to them by their superiors." *Id.* at 1096.

Defendant has never claimed his actions were directed by SRS; he consulted SRS;[18] or SRS asked him to investigate the matter. Although he told Mrs. Franz on his first visit she would be contacted by SRS and, on the next day, told her he was investigating for SRS, no evidence in this record supports those statements. When combined with defendant's uniformed presence, these statements reinforce a picture of the "paradigm case of 'submission to a claim of lawful authority.'" *Good*, 891 F.2d at 1095 (quoting *Schneckloth*, 412 U.S. at 233, 93 S.Ct. at 1051).

## V.

Finally, we must observe our judgment does not overlook or minimize the serious problems of child abuse and neglect and the emotionally charged arena in which they arise. Neither do we depreciate the defendant's expressed concern for the child nor doubt the sincerity of that concern. However, we must be sensitive to the fact that society's interest in the protection of children is, indeed, multifaceted, composed not only with concerns about the safety and welfare of children from the community's point of view, but also with the child's psychological well-being, autonomy, and relationship to the fam-

---

17. Defendant's own statements reveal, whether he was acting on a hunch or actually detected evidence coalescing into a probable cause determination, he had stepped out-of-bounds and overreached from his area of expertise into one he knew little about. In his deposition, he explained although he didn't feel any bumps, he wasn't checking for anything in particular, and had no idea what the examining physician did. "I have no idea what [the doctor] did. I'm not versed in medical examinations."

18. In his deposition, defendant stated without explanation he called in a report to SRS after going to the Brickley home and perhaps reported to SRS the following morning. At this stage in the proceedings, however, the record is unclear on this matter although defendant stated that while waiting 30 minutes for Mr. Franz to come home, he did not call SRS to inform them of his actions.

ily or caretaker setting. *See, e.g.,* Steven F. Shatz, Molly Donovan, Jeanne Hong, *The Strip Search of Children and the Fourth Amendment,* 24 U.S.F.L.Rev. 1 (1991); Christina B. Sailer, *Qualified Immunity for Child Abuse Investigators: Balancing the Concerns of Protecting our Children from Abuse and the Integrity of the Family,* 29 J.Fam.L. 659 (1990). Deciding that police officers, functioning as police officers, must conduct themselves by the constitutional norms that embrace their training, should not deter their concern for the well-being of children and families, but heighten their awareness of their proper role within these boundaries.

We must further underscore the defendant's motive to protect the child in this instance does not vitiate plaintiffs' Fourth Amendment rights. That motive, however, may enter the calculus of the damages, if any, that his actions justify. We must leave that determination for a jury.

Therefore, on this record and under the particular circumstances of this case, we must eschew defendant's suggestion to decide as a matter of first impression, in the investigation of claims of child abuse and neglect, police officers are absolved of a warrant or probable cause requirement. At the time of defendant's actions, the law was clearly established that the information the officer possessed rendered the present warrantless searches objectively unreasonable barring his claim of qualified immunity so that plaintiffs' § 1983 and pendent state law action may proceed.

**AFFIRMED.**