**Stana LAUGHTER, an individual on her own behalf and as next friend of her minor child, Tyler Ralstin, Plaintiff,**

**v.**

**Preston KAY and Ryan Evans, Defendants.**

No. 96–C–579 S.

United States District Court, D. Utah, Central Division.

Oct. 29, 1997.

---

1. The portion of *Sluys* quoted by plaintiff is dicta, and the decision concerned a motion to dismiss under Rule 12(b).

John Pace, Disability Law Center, Salt Lake City, UT, Pamela M. Martinson, American Civil Liberties Union of Utah, Salt Lake City, UT, Jensie L. Anderson, Cannon Cleary & Associates, Salt Lake City, UT, for Plaintiffs.

Elizabeth King, Utah Attorney General's Office Litigation Unit, Salt Lake City, UT, for Defendants.

## MEMORANDUM & ORDER

BOYCE, United States Magistrate Judge.

Plaintiff filed suit under 42 U.S.C. § 1983 against defendants Preston Kay and Ryan Evans, employees of the Utah Department of Corrections (UDOC), alleging that they violated her Fourth Amendment rights and those of her son, Tyler Ralstin. In accordance with the provisions of 28 U.S.C. § 636(c)(1), the case was referred to the magistrate judge to conduct all proceedings and order the entry of judgment. (Stip., file entry 37; Order of Reference, file entry 44.) The case is presently before the court on cross-motions for summary judgment. (File entries 22 & 34.)

### I. FACTS

█ At the time relevant to this case, plaintiff's husband, Curtis Laughter, was an inmate at the Central Utah Correctional Facility (CUCF). (Verified Compl. ¶ 1.)[1] Defendants Kay and Evans were UDOC investi-

---

1. Plaintiff's verified complaint is treated as an affidavit on a motion for summary judgment. *Hayes v. Marriott*, 70 F.3d 1144, 1148 (10th Cir. 1995); *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir.1991); *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir.1988).

gators. (1st Evans aff. ¶ 1; 1st Kay aff. 1, attachments 1 & 2, respectively, to Defs.' Mem. Supp. Mot. Summ. J., file entry 23.)

From September 1992 to October 1993, plaintiff visited Curtis Laughter at the CUCF on a regular basis. On some occasions, she was accompanied by her son, Tyler Ralstin. (Verified Compl. ¶ 8.) During this period, she was routinely questioned and her vehicle was searched prior to visits. However, no illegal substances, paraphernalia, or other contraband were found. (*Id.* ¶ 9.) On October 31, 1992 and in April 1993, canine searches of plaintiff's vehicle were conducted. Again, no illegal substances or contraband were found. (*Id.* ¶¶ 10–11.)

On April 11, 1993, plaintiff and Curtis Laughter were married at the CUCF. Prior to the ceremony, plaintiff's belongings and clothing were searched. In addition, she was subjected to a patdown of her person and a canine search of her vehicle. Once again, no illegal substances or contraband were found. (*Id.* 1 12.)

When plaintiff went to visit on October 4, 1993, the vehicle she was driving again was searched. On that occasion, syringes were found in the trunk of the vehicle. Plaintiff states that although neither the vehicle nor the syringes belonged to her, her visiting privileges were suspended. (*Id.* ¶ 13.)

On October 6 and 8, 1993, plaintiff called the CUCF to find out when her visiting privileges would be reinstated. On October 8, 1993, Officer Michael Jensen informed her that her visits would be reinstated on October 9, 1993. (*Id.* ¶ 14.)

On October 8, 1993, defendant Kay submitted an Affidavit for Search Warrant to Justice Court Judge Ned Jensen requesting a warrant to search the persons of "Stana Alberti Laughter and child accompanying (Including all body cavities) Stana Alberti Laughter. And Delila A. Russon." (Aff. for Search Warrant at 1, attached to Verified Compl. as ex. A.) The object of the search was to discover "LSD and marijuana and/or other controlled substances." (*Id.*) The affidavit in support of the search warrant contained the following factual allegations:

1) That the undersigned is an Investigator with the Utah Department of Corrections assigned to the Central Utah Correctional Facility.

2) I have learned through information from officers [sic] reports that while monitoring Terry Perdue [sic] phone conversation with his wife that "it took three or four days for me to make $600.00 dollars. We can do it again later this week. That money will pay for our phone bill and give you some extra money"

3) An informant at the Central Utah Correctional Facility has advised Officer P. Patrick that, "inmate Perdue has been selling hits of acid off paper. There are five sheets, 100 to a sheet. They are selling for $15.00 a hit"

4) Officers have confirmed that * *see below* has contact visits with her husband. Additional information leads officers to believe that during her contact visit she will attempt to pass a controlled substance.

Your affiant considers the information received from the confidential informant reliable because:

Urinalysis's [sic] were done on Inmate Perdue and his cell mate and both tested positive for LSD.

. . . . .

*Stana Alberti Laughter and child accompanying Stana Alberti Laughter
*Delila A. Russon.

(Aff. for Search Warrant at 2.)

Plaintiff states that she did not know Terry Perdue. Further, plaintiff's husband, Curtis Laughter, was not Perdue's cellmate. (Verified Compl. ¶ 17.)

On October 8, 1993, Justice Court Judge Jensen signed a search warrant authorizing a search of "Stana Alberti Laughter and child accompanying (Including all body cavities) Stana Alberti Laughter. Delila A. Russon." (Search Warrant attached to Verified Compl. as ex. B.)

About noon on October 9, 1993, plaintiff, who was six months pregnant with Laughter's child, arrived at the CUCF to visit her husband. She was accompanied by her two-and-one-half-year-old son, Tyler Ralstin.

(Verified Compl. ¶ 19.) Upon her arrival, the officers at the front gate asked to search plaintiff's vehicle. Plaintiff consented and the officers conducted a visual and canine search. In addition, a female officer searched plaintiff's purse and other personal effects. No illegal substances or contraband were found. (*Id.* ¶¶ 20–21.)

Following the search, plaintiff parked her vehicle and walked to the building for her standard visitation. At that point, she was approached by defendant Evans and another male officer. Defendant Evans showed his identification and informed plaintiff that he had a search warrant to search her body cavities and those of her son and also to search her car. When plaintiff informed defendant Evans that the car had already been searched, defendant Evans told her that it would have to be searched again. (*Id.* ¶¶ 22–23.)

Defendant Evans walked plaintiff back to her car. He then took from her the child's diaper and a spare pair of the child's underwear and pants. He thoroughly searched the child's diaper and clothing, but found nothing. (*Id.* ¶ 25.) Two other officers and a dog then searched plaintiff's vehicle and the child's clothing in the possession of defendant Evans. Again, nothing was found. (*Id.* ¶ 26.)

Plaintiff was then told to accompany defendant Evans and a female officer to the hospital. She asked if she was under arrest and was told that she was not. Nevertheless, defendant Evans stated that plaintiff would have to be handcuffed pursuant to standard procedure. However, when plaintiff protested about being handcuffed in front of her son, the officers did not put the handcuffs on her. (*Id.* ¶¶ 27–28.)

The officers then drove plaintiff and her son to the Gunnison Hospital. While they were waiting for a doctor to perform the search, defendant Evans twice asked plaintiff if she or her son had "anything" on them. She responded that they did not. (*Id.* ¶¶ 29–31.)

A nurse and a female officer then approached plaintiff and took her to the emergency room where the nurse gave her a gown. The officer ordered plaintiff to undress. As she did so, the officer searched each piece of her clothing. However, nothing was found. Plaintiff then put on the gown and sat on the examination table waiting for the doctor. (*Id.* ¶ 32.)

The doctor came into the room and explained to plaintiff that he could not force her to submit to the search; however, he stated that he had to do it. He further stated that he would make it as easy for her as he could. (*Id.* ¶ 33.)

While the female officer remained in the room, the doctor conducted the search. He checked plaintiff's eyes, nose, ears, head, arms, stomach, legs, feet, and hands. He then performed a vaginal search, using a speculum, and a rectal search, using his gloved hand. Plaintiff stated several times during the vaginal search that it was very painful to her and that the speculum was pinching her. Plaintiff alleges that the rectal search was also very painful. (*Id.* ¶ 34.) No illegal substances, contraband, or paraphernalia were found as a result of the search. (*Id.* ¶ 35.)

· After plaintiff was dressed, her son was brought into the room to be searched. The doctor undressed the boy and conducted a visual rectal search. He also examined the boy's genital area. (*Id.* ¶ 36.)

After the search was concluded, plaintiff and her son were driven back to the CUCF by correctional officers. Defendant Evans told plaintiff that her son's diaper would be retained for evidence even though nothing had been found during the search of the diaper. (*Id.* ¶ 37.) Plaintiff was then taken to defendant Evans's office where he told her that even though nothing was found as a result of the searches, he still believed that she was bringing drugs into the facility. Consequently, her visits with her husband would be terminated. Plaintiff was then told that she was free to go. (*Id.* ¶¶ 38–39.) Although plaintiff subsequently attempted to visit her husband, her visits were suspended for almost a year following the incident. (*Id.* ¶ 43–44.)

Plaintiff states that over the next several days, she experienced vaginal bleeding. As a

result, she saw her obstetrician who told her that her vaginal wall had been torn during the vaginal search with the speculum. The obstetrician ordered plaintiff to curtail her activities and get significant bed rest in order to avoid complications with her pregnancy. Plaintiff had not experienced any such complications prior to the search. Plaintiff's obstetrician also suggested that she get counseling to address the stress and depression she was experiencing as a result of the search and its aftermath. (*Id.* 40–42.)

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be entered if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A party moving for summary judgment bears the initial burden of informing the court of the basis of its motion. It may do so by identifying portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, that demonstrate that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In response, the nonmoving party must go beyond the pleadings and by affidavits, or by depositions, answers to interrogatories, and admissions, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. If the nonmoving party fails to meet this burden, summary judgment is mandated. *See id.* at 322, 106 S.Ct. at 2552–53.

## III. DISCUSSION

### A. *Qualified Immunity*

Plaintiff alleges that the body searches violated her Fourth Amendment rights and those of her son because the warrant was not supported by probable cause. In response, defendants argue that they are entitled to qualified immunity.

 Government officials are entitled to qualified immunity so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In the instant case, the question is whether a reasonably well-trained officer in defendants' position would have known that the affidavit failed to establish probable cause for the search and that they should not have applied for the warrant. *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986). *See also United States v. Leon,* 468 U.S. 897, 922 n. 23, 104 S.Ct. 3405, 3420 n. 23, 82 L.Ed.2d 677 (1984) (stating, in the context of a suppression hearing, "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."); *Franz v. Lytle,* 997 F.2d 784, 787 (10th Cir.1993) (stating that officer conducting warrantless search was entitled to qualified immunity if a reasonable officer in the same position would have believed that he was acting in accord with Fourth Amendment principles)

### 1. *Clearly Established Law*

 At the time of the search, the law was clearly established that before a valid search warrant can be issued, the judicial officer issuing the warrant must be supplied with sufficient information to support an independent judgment that "probable cause" exists for the issuance of the warrant. U.S. Const. amend. IV; *Whiteley v. Warden, Wyoming State Penitentiary,* 401 U.S. 560, 564, 91 S.Ct. 1031, 1034–35, 28 L.Ed.2d 306 (1971); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Rugendorf v. United States,* 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); *Specht v. Jensen,* 832 F.2d 1516, 1522 (10th Cir. 1987). The duty of a reviewing court is to ensure that the magistrate who issued the

warrant had a "substantial basis" for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 236, 238–39, 103 S.Ct. 2317, 2331, 2332–33, 76 L.Ed.2d 527 (1983); *Jones v. United States*, 362 U.S. at 271, 80 S.Ct. at 736; *see United States v. Harris*, 403 U.S. 573, 577–83, 91 S.Ct. 2075, 2078–82, 29 L.Ed.2d 723 (1971). In making this determination, the court uses a "totality of the circumstances" approach. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527.

### 2. *Sufficiency of the Affidavit*

■ In the instant case, the information contained in defendant Kay's affidavit can be summarized as follows: Officers had monitored a telephone conversation between inmate Perdue and his wife in which Perdue stated that he had made $600 in three or four days. Further, a confidential informant had told an officer that inmate Perdue was selling hits of acid. Defendant Kay considered this information reliable because urinalyses of inmate Perdue and his cellmate were positive for LSD. In addition, officers had confirmed that plaintiff had contact visits with her husband. Finally, the affidavit states that further information led officers to believe that plaintiff would attempt to pass controlled substances during these visits.

It cannot seriously be argued that defendant Kay's affidavit provided probable cause for the warrant. Nothing in the affidavit connected plaintiff or her husband to the alleged activity of inmate Perdue. The conclusory statement that further information led defendants to believe that plaintiff was going to pass a controlled substance during a visit with her husband is completely devoid of any facts to support this conclusion. In particular, there are no facts to suggest that controlled substances would be secreted in a body cavity, in the vehicle, or on the child.

The Supreme Court has held similarly conclusory, bare bones affidavits to be inadequate. For example, a sworn statement by

an officer that he had cause to suspect and did believe that illegal liquor was located on certain premises was insufficient to establish probable cause. *Nathanson v. United States*, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933). Similarly, officers' sworn statement that they had received reliable information from a credible person and believed that heroin was stored in a house was inadequate. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Likewise, a sheriff's sworn statement that "defendants did then and there unlawfully break and enter a locked and sealed building" did not provide probable cause for the issuance of an arrest warrant and the search incident thereto. *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306, (1971).

In addition to the deficiencies already noted, the affidavit contained no allegation whatsoever concerning plaintiff's son. In short, no reasonably competent officer could have believed that the affidavit established probable cause for a body cavity search of plaintiff and her child. *See Malley*, 475 U.S. at 345, 106 S.Ct. at 1098. Accordingly, defendants are not entitled to qualified immunity.

### 3. *Additional Facts Allegedly Presented to Judge Jensen*

■ Defendants assert that they presented additional information to Judge Jensen, not contained in the affidavit, which established probable cause for the issuance of the warrant.[2] Defendants argue that because no clearly established law required that all information supporting probable cause be contained within the four corners of the affidavit, they are entitled to qualified immunity.

■ Defendants point to Utah Code Ann. § 77–23–203 which states that a search warrant "shall not issue except upon probable cause supported by oath or affirmation."

---

**2.** "It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention." *Aguilar v. Texas*, 378 U.S. at 109 n. 1, 84 S.Ct. at 1511 n. 1. Under well-established law, an otherwise insufficient affidavit cannot be rehabilitated by testimony of the officer concerning information he possessed when he sought the warrant, but which he did not disclose to the issuing magistrate. *Whiteley*, 401 U.S. at 565 n. 8, 91 S.Ct. at 1035 n. 8 . A contrary rule would render the Fourth Amendment warrant requirement meaningless. *Whiteley*, 401 U.S. at 565 n. 8, 91 S.Ct. at 1035 n. 8.

Defendants contend that under this provision, sworn information presented orally to a magistrate satisfies the requirement and no written record is required. Defendants concede, however, that under Utah Code Ann. § 77–23–204(1), "[a]ll evidence to be considered by a magistrate in the issuance of a search warrant shall be given on oath and either reduced to writing or recorded verbatim." It is undisputed that the additional evidence allegedly presented by defendants to Judge Jensen was not reduced to writing or recorded as required by Utah Code Ann. § 77–23–204(1). Further, Utah law at the time of the search was clearly established that the testimony supporting a warrant must be reduced to writing. *See State v. Lopez*, 676 P.2d 393 (Utah 1984); *State v. Jasso*, 21 Utah 2d 24, 439 P.2d 844 (1968). Accordingly, this militates against defendants' qualified immunity claim. Nevertheless, the court will address the additional information that defendants contend establishes probable cause for the warrant.

Defendants state that prior to the search, they had been conducting an investigation into drug trafficking at the CUCF. (1st Evans aff. 1 4; 1st Kay aff. ¶ 4, attachments I & II, respectively, to Defs.' Mem. Supp. Mot. Summ. J., file entry 23.) Defendants state that during the investigation, they developed information that Renee Perdue and Delila Russon, wives of inmates Terry Perdue and David Russon, and plaintiff were bringing drugs into the facility. (1st Evans aff. ¶ 4; 1st Kay aff. ¶ 4.) Subsequently, defendant Evans's investigation focused on plaintiff while defendant Kay's investigation focused on Delila Russon. (1st Evans aff. ¶ 5; 1st Kay aff. ¶ 5.)

Defendant Evans states that several factors led him to believe that plaintiff possibly was the "mule" who was bringing drugs into the prison. (1st Evans aff. ¶ 5.) On September 25, 1993, Housing Sergeant John Irons told him that an inmate had information concerning drugs coming into the CUCF. Sergeant Irons gave defendant Evans a note received from the inmate informant. Defendant Evans states that the note was written by someone identified as "Tommy" and contained the phone number of the contact person where drugs could be obtained. The note also contained plaintiff's name and address. (*Id.* ¶ 6.) Defendants have provided a copy of the handwritten note which states as follows:

> tell your lady to call this number
> 972–0821
> and ask for paul, tell him it's for me (Tommy) He'll gave [sic] her the address to come and pick up the thing. afterward, tell her to deliver it to this address
> Stana Laughter
> 310 South—100 West # 5
> Salina, Utah 84654

(Note, attachment A to 1st Evans aff.) Written at the bottom of the note in different handwriting is the following:

> Paul Branch
> 2546 S. Lake Park Cir. # 3
> West Valley 972–0821

(*Id.*)

Defendant Evans states that for several months, SWAT Officer Steve Nelson had been monitoring inmate phone calls. Through these conversations, Officer Nelson had identified several inmates suspected of drug trafficking into the CUCF, including inmates Terry Perdue, David Russon, and Curtis Laughter. (1st Evans aff. ¶ 7.) Defendant Evans states that during Officer Nelson's monitoring of the inmate calls, the person who was to bring the drugs into the CUCF was repeatedly referred to as "7–Eleven." (*Id.* ¶ 8.) Defendant Evans further states that when plaintiff came to visit her husband on October 4, 1993, nine syringes were found in the trunk of the car she was driving. (*Id.* ¶ 9.) Defendant Evans states that the following day, October 5, 1993, Officer Nelson overheard a telephone conversation between inmate Perdue and his wife Renee in which Perdue told Renee to be sure to call "7–Eleven" before taking drugs to her because she had been caught bringing syringes into the prison the day before and was not allowed to visit. (*Id.* 10.) Defendant Evans states that on October 6, 1993, investigators heard a telephone conversation between David Russon and his wife Delila in which Russon informed his wife, "A certain girl that we know got caught, shot needles on

the floor of her car .... it will be nice not to have all that screaming little red head running around." (*Id.* ¶ 11.) At the time of the search, plaintiff's son was approximately three years old and had red hair. (Pl.'s Resp. Req. Admis. 5, attached as ex. A to Pl.'s Mem. Supp. Summ. J. Mot. & Opposing Defs.' Summ. J. Mot., file entry 35.)

Defendant Evans states that on October 8, 1993, he was informed by Officer Steve Pyper that Pyper's mother had told him that plaintiff would be visiting the prison with her son on October 9, 1993 and that she would have drugs on her person or with the child, possibly in the child's diaper. (1st Evans aff. ¶ 12.)

Defendant Kay states that during a monitored phone conversation, Officer Nelson heard inmate Perdue tell his wife Renee that Delila Russon was the new contact person for importing drugs into the CUCF. (1st Kay aff. ¶ 7.) Further, during another monitored phone conversation, Officer Nelson heard inmate Russon inform his wife Delila that he had a part-time job for her at which she could make $300 a month. According to Officer Nelson, inmate Russon explained that Renee Perdue would come down to stay and give Delila Russon the drugs. (*Id.* ¶ 8.) Officer Nelson identified the date of October 11, 1993 as the day that Delila Russon was supposed to bring the drugs into the CUCF. (*Id.* ¶ 9.) Defendant Kay states that based upon the above information, he obtained a body cavity search warrant for Delila Russon from Judge Jensen.[3] (*Id.* ¶ 10.)

Defendant Kay states that on October 8, 1993, while he was in Judge Jensen's chambers, he received a telephone call from defendant Evans who knew he would be there for the purpose of obtaining a search warrant for Delila Russon. (2d Kay aff. ¶¶ 4–5, attached to Defs.' Reply Mem. Supp. Mot. Summ. J. & Resp. Pl.'s X–Mot. Summ. J., file entry 38.) Defendant Evans communicated the information he had gathered implicating plaintiff in drug-transporting at the CUCF. Defendant Evans felt the need to act immediately because plaintiff might visit the CUCF the next day, October 9, 1993. (*Id.* ¶ 6.) Based on the information provided by defendant Ev-

ans, defendant Kay added the names of plaintiff and her son to the search warrant for Delila Russon. (1st Kay aff. ¶ 12.) Defendant Kay states that he also communicated the information provided by defendant Evans to Judge Jensen. (2d Kay aff., ¶ 7.) Judge Jensen then approved the search warrant for plaintiff and her son. (1st Kay aff. ¶ 13; 2nd Kay aff. ¶ 8.)

Defendants contend that these additional facts, allegedly presented to Judge Jensen, provide ample probable cause to support the issuance of the search warrant. In determining whether probable cause existed for the issuance of the search warrant, the court considers the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527. The court will therefore take into consideration all of the evidence offered by defendants to support a conclusion that the information allegedly presented to Judge Jensen established probable cause for the warrant.

The "veracity" or "reliability" of an informant and his "basis of knowledge" are relevant considerations in the "totality of the circumstances" analysis. *Gates*, 462 U.S. at 233, 238, 103 S.Ct. at 2330, 2332. Further, the Court has recognized that the details of an informant's tip may be corroborated by independent police work. *Id.* at 241, 103 S.Ct. at 2333–34. *See Jones v. United States*, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960); *Aguilar*, 378 U.S. at 109 n. 1, 84 S.Ct. at 1511 n. 1; *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

In *Gates*, an anonymous informant sent the police a much more detailed letter than the note at issue here. The letter informed police that drugs could be found in the car and house belonging to the Gates. In analyzing whether probable cause existed for the issuance of a search warrant, the Supreme Court stated that it was inclined to agree with the Illinois Supreme Court that the anonymous letter, standing alone, would not provide the basis for a determination that probable cause existed to believe that contraband would be found in the Gates's car and house. This was

---

3. The warrant to search Delila Russon was never executed. (1st Kay aff. ¶ 14.)

so because the letter provided no basis for concluding that the author was either honest or the information reliable; likewise, the letter gave absolutely no indication of the basis of the writer's knowledge regarding the Gates's criminal activities. *Gates,* 462 U.S. at 227, 103 S.Ct. at 2326. However, because many of the facts contained in the letter were corroborated by independent police work and because the range of details in the letter related to facts not easily obtained, suggesting that they were obtained from the Gates themselves or from someone they trusted, the Court concluded that probable cause for a search warrant existed. *Gates,* 462 U.S. at 243–46, 103 S.Ct. at 2334–36.

In the instant case, the note obtained from the confidential inmate informant provides little to support a determination that probable cause existed to conduct a body cavity search of plaintiff and her child. First, no information is provided as to the informant's reliability or veracity. The note itself does not mention drugs or state that plaintiff is going to bring drugs into the facility. Rather, it refers mysteriously to a "thing" that someone is to pick up and deliver to plaintiff's address. Further, it contains no clue as to the identity of the writer, allegedly named "Tommy," or his relationship to plaintiff, if any. Unlike the letter in *Gates,* the note in the instant case simply provides no basis to conclude that drugs would be secreted in the body cavities of either plaintiff or her child when she came to visit on October 9, 1993.

Turning next to the monitored inmate telephone conversations, the court finds nothing to support a determination that probable cause existed to believe that plaintiff was going to transport drugs into the CUCF on the date in question.[4] During their respective conversations, both Terry Perdue and David Russon appear to refer to the incident in which syringes were discovered in a car plaintiff was driving. However, it is clear from Russon's conversation with his wife Delila that he believed that plaintiff would not be allowed to visit the CUCF precisely as a result of the incident. The pertinent portion

of the conversation, monitored October 6, 1993, is as follows:

H [5] You don't have to worry about whats [sic] her name in the visiting room, we get it to ourselves from now on.

W For how long.

H Probably ever.

W Why?

H Cause a certain girl got caught shot needles under the floor of her car.

W oh, yeah someone was telling me about that.

H That same someone.

W Yeah.

H And their [sic] over forever, right or not.

W I don't know about that, probably for maybe a month or so.

H Thats [sic] pretty serious, it will be nice not having that screaming little redhead running around.

W No doubt.

H Have it to ourselves.

. . . . .

H Yeah, and we don't care, as long as we don't have to put up with them fighting to get a visiting room, don't have to look at the screaming brat.

(Ex. C.)

The foregoing comments do not support defendants' belief that plaintiff would act as a mule on October 9, 1993. Rather, they show Russon's clear understanding that plaintiff was barred from entering the CUCF because of the syringe incident. Further, the comments were made during the same conversation in which inmate Russon told his wife about her new "part-time job" which, according to defendants, was to smuggle drugs into the CUCF. Thus, if defendants are correct, it is logical to assume that even if plaintiff had transported drugs into the prison in the past, she would not do so on October 9, 1993.

---

4. Plaintiff has provided the court with transcripts of these conversations. (Ex. B & C to Pl.'s Mem. Supp. Summ. J. Mot. & Opposing Defs.' Summ. J. Mot., file entry 35.)

5. According to the transcript, "H" is inmate David Russon; "W" is Delila Russon.

Regarding the monitored phone conversation between Terry and Renee Perdue on October 5, 1993, defendant Evans states in his affidavit that "Terry Perdue told Renee Perdue to be sure to call "7–Eleven" before taking drugs to her because she had been caught bringing syringes into the prison the day before and was not allowed to visit." (1st Evans aff. ¶ 10.) Plaintiff objects to this statement as misleading on the ground that Perdue did not refer to "7–Eleven" (purportedly a reference to a drug "mule") during the conversation, nor did the conversation indicate that plaintiff had "muled" drugs into the CUCF or intended to do so in the future.

As plaintiff asserts, a review of the transcript of this conversation reveals that Perdue did not mention "7–Eleven" or make any explicit statement concerning drugs although he did appear to instruct his wife to call plaintiff. (See tr., ex. B to Pl.'s Mem. Supp. Summ. J. Mot. & Opposing Defs.' Summ. J. Mot., file entry 35.) Further, a conversation monitored the following day, October 6, 1993, between Renee Perdue and Terry Perdue's cellmate undermines any conclusion that plaintiff was to bring drugs to the CUCF on October 9, 1993. In this conversation, Perdue's cellmate told Renee that he had a message from Terry. The pertinent part of the conversation is as follows:

> C[6] [Terry Perdue says] he knows the 7–11 closed last week, but there's a new 7–11 open Monday in the same general area.
>
> R Oh really?
>
> C Yeah, you know the clerk Alana, she asked you to spend a weekend once."
>
> R Uh.
>
> C Ok, this 7–11 will be open a long time a reliable store.
>
> R Yeah.
>
> C So we will get you the number to call or visa [sic] versa, Clark will call you Saturday night to give instructions.
>
> R Ok.
>
> C Ok, also Terry said, do go get those clothes at Mervyn's and K-mart, you got them on layaway remember the

due date is still Monday 4:00 pm otherwise it will hurt your credit card so nothing is changed, just get the clerk working, she's nicer, the Alana lady love'understand.

(Tr., ex. B to Pl.'s Mem. Supp. Summ. J. Mot. & Opposing Defs.' Summ. J. Mot., file entry 35.) Thus, even if defendants believed that plaintiff had acted in the past as the "7–Eleven" who brought drugs into the CUCF, this conversation makes it clear that a new "7–Eleven" had been selected. Moreover, there is no credible evidence that plaintiff ever was the 7–Eleven. Further, defendants admit in their affidavits that "[t]hrough the wire-tapped conversations, it was clear that the inmates were planning on finding another 'mule' to transport the drugs into CUCF." (1st Evans aff. ¶ 14; 1st Kay aff. ¶ 12.) Finally, defendants state that Officer Nelson had identified the date of October 11, 1993, as the date that Delila Russon was supposed to bring the drugs into the CUCF. (1st Kay aff. ¶ 9.) Accordingly, it was not reasonable for them to believe that plaintiff would be transporting drugs into the CUCF on October 9, 1993.

Defendants also rely on the fact that syringes were discovered in the trunk of the car plaintiff was driving on October 4, 1993. As discussed, plaintiff states that neither the car nor the syringes belonged to her. (Verified Compl. ¶ 13.) Evidence in the record shows that an investigation by CUCF officers established that the car belonged to an individual identified by plaintiff at the time of the search as Craig Crane. The officers found that the car was registered to Mr. Crane, its license was current, and the address for Crane given by plaintiff was the same as that shown by the registration. (Report at 3, ex. B to 1st Evans aff.) Further, at the time of the October 4, 1993 search, plaintiff told the officer that the water pump on her car had gone out and that Mr. Crane was going to fix it the next day. The officer noted in his report that there was a water pump sitting in the back seat of the car plaintiff was driving. (*Id.* at 2.) The officer also noted in his report that one of the syringes appeared to have been used. The officer reported that

6. "C" is Terry Perdue's cellmate; "R" is Renee Perdue.

he hid the used syringe under a cement barricade at the Vehicle Directional Station. He then had his drug dog search for any controlled substance around the barricade. However, the dog did not indicate where the syringe was hidden. (*Id.* at 2–3.)

The fact that the officer found the syringes does not support a finding of probable cause since the evidence tends to show that the syringes did not belong to plaintiff and that the used syringe had not been used for the injection of a controlled substance. In addition, the search warrant was for LSD and marijuana, drugs not commonly administered by injection. Moreover, it should be noted that the syringes could have been possessed by Mr. Crane for a legitimate purpose such as the injection of insulin.

Finally, the tip from Officer Pyper's mother adds little to support the probable cause determination. Even assuming the veracity of Officer Pyper's mother is beyond reproach (which is not developed), there is nothing to show that she had any basis for this information. Without a showing that Officer Pyper's mother had some "basis of knowledge," the tip is simply so lacking in indicia of reliability that it cannot suffice as probable cause for the issuance of a warrant. Accordingly, after considering the totality of the circumstances, the court concludes that the additional evidence allegedly presented to Judge Jensen does not establish probable cause for the search.

■ Defendants repeatedly emphasize that they believed that they had probable cause for the search. However, the relevant issue is the objective question whether a reasonable officer could have believed the search to be lawful in light of clearly established law and the information defendants possessed. Defendants' subjective beliefs are irrelevant. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987); *Franz v. Lytle,* 997 F.2d at 787. Under the facts of this case, no reasonable officer could have believed the searches at issue were lawful. Accordingly, defendants are not entitled to qualified immunity.

## B. Prison Visitor Justification

■ Defendants contend that even if they lacked probable cause, the search was lawful because plaintiff and her son were "prison visitors." Defendants state that under the prison visitor exception to the warrant requirement, they need only show the existence of "reasonable suspicion" to justify the search.

■ It is well-established that warrantless searches are per se unreasonable under the Fourth Amendment subject to a few specific and well-delineated exceptions. *California v. Acevedo,* 500 U.S. 565, 580, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991); *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Franz v. Lytle,* 997 F.2d at 787. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973) (consent); *Mincey,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (exigent circumstances); *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (administrative searches). As defendants point out, the Tenth Circuit has held that a warrantless strip search of a "prison visitor" when supported by "reasonable suspicion" is constitutionally permissible. *Romo v. Champion,* 46 F.3d 1013, 1020 (10th Cir.1995), *cert. denied,* 516 U.S. 947, 116 S.Ct. 387, 133 L.Ed.2d 309 (1995); *Boren v. Deland,* 958 F.2d 987, 988 (10th Cir.1992). Other circuits also have applied the "reasonable suspicion" standard to the search of prison visitors. *See. e.g., Varrone v. Bilotti,* 123 F.3d 75 (2d Cir.1997); *Wood v. Clemons,* 89 F.3d 922, 929 (1st Cir. 1996); *Daugherty v. Campbell,* 935 F.2d 780 (6th Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992); *Thorne v. Jones,* 765 F.2d 1270, 1277 (5th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); *Hunter v. Auger,* 672 F.2d 668, 674–75 (8th Cir.1982). To justify a strip search under the "reasonable suspicion" standard, prison authorities must point to specific, objective facts and rational inferences that they are entitled to draw from those facts in light of their experi-

ence. *Boren,* 958 F.2d at 988. In addition, the suspicion must be individualized. *Id.*

The First Circuit has described the various levels of nude searches of the person:

> A "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

*Blackburn v. Snow,* 771 F.2d 556, 561 n. 3 (1st Cir.1985). Although the parties refer to the search in this case as a "strip search," it was actually a "manual body cavity search" which is a much more intrusive procedure than an ordinary strip search. Because of the level of intrusiveness, the court concludes that the more stringent "probable cause" standard, rather then "reasonable suspicion" applies as discussed below. It should be noted, however, that even the lesser "reasonable suspicion" standard was not met in this case. *See Spear v. Sowders,* 33 F.3d 576, 582 (6th Cir.1994) (no reasonable suspicion for search based on statement of confidential inmate informant that an inmate was receiving drugs every time a young, unrelated female visited where no other information indicated that she was carrying drugs); *Daugherty v. Campbell,* 33 F.3d 554, 556–57 (6th Cir.1994) (holding that uncorroborated tips do not create reasonable suspicion); *Hunter v. Auger,* 672 F.2d 668, 677 (8th Cir.1982) (finding no reasonable suspicion where strip search decision was based on uncorroborated anonymous tips stating that certain prison visitors would attempt to smuggle drugs to relatives during visits).

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court approved a warrantless search of an individual based upon the reasonable belief that he was armed and thus presented a danger to the investigating officer or others. In approving the search, the Court noted that it was limited to a "patdown" of the suspect's body in which the officer patted down the outer clothing of the suspect and his companions. He did not put his hands in their pockets or underneath their outer clothing until he felt guns; then he merely reached in and removed the weapons. Thus, the officer confined the search to that which was minimally necessary to determine if the men were armed and to disarm them after he discovered the weapons. The Court observed that the officer did not conduct a general exploratory search for whatever evidence of crime he might find. *Id.* at 29–30, 88 S.Ct. at 1883–85. Nevertheless, the Court stated that "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Id.* at 24–25, 88 S.Ct. at 1881.

Here, the intrusion was much greater than in *Terry.* As the Tenth Circuit has observed, "[O]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes." *Hayes v. Marriott,* 70 F.3d 1144, 1146 (10th Cir.1995) (alteration in original) (quoting *Canedy v. Boardman,* 16 F.3d 183, 185 (7th Cir.1994). *See also Romo,* 46 F.3d at 1019 (stating "the strip search of an individual by government officials, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience.' ") (quoting *Boren,* 958 F.2d at 988 n. 1).)

In the prison context, the Supreme Court has concluded that visual body-cavity inspections of inmates can be conducted on less than probable cause to further legitimate security interests. *Bell v. Wolfish,* 441 U.S. 520, 560, 99 S.Ct. 1861, 1885, 60 L.Ed.2d 447 (1979). The Court stated, however, that "this practice instinctively gives us the most pause." *Id.* at 558, 99 S.Ct. at 1884. In approving the searches, the Court noted that inmates were "not touched by security personnel at any time during the *visual* search procedure." *Id.* at 558 n. 39, 99 S.Ct. at 1884 n. 39 (emphasis in original).

Regarding more intrusive searches, the Court concluded that even following a full evidentiary hearing, the Fourth Amendment prohibited a search involving the surgical removal of a bullet from a suspect against his will. *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). In *Winston,*

the Court noted the importance of probable cause: "Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned." *Id.* at 760–61, 105 S.Ct. at 1616 (quoting *Schmerber v. California,* 384 U.S. 757, 770, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966)) Even though probable cause for the search existed, the Court concluded that it would not be "reasonable" under the Fourth Amendment to search for the evidence by the contemplated surgical procedure. *Winston v. Lee,* 470 U.S. at 766–67, 105 S.Ct. at 1619–20.

Based upon the foregoing authority, the court concludes that under the circumstances of the instant case, a manual body cavity search could not be conducted without a valid search warrant based upon probable cause. *See also State v. Clark,* 65 Haw. 488, 654 P.2d 355 (1982) (holding that absent exigent circumstances, a warrant is required for the manual body cavity search of an arrestee) *State v. Fontenot,* 383 So.2d 365 (La.1980) (same)

■ Moreover, there is a further and even more compelling reason why defendants may not justify the search based upon the "prison visitor" exception to the warrant requirement. Generally, the purpose of a "prison visitor" search is to further prison security interests by preventing contraband from entering the prison. *See Romo,* 46 F.3d at 1015–16, 1017; *Hunter,* 672 F.2d at 674; *Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir.1977); *see also, Boren,* 958 F.2d at 988 (noting that other circuits have applied the reasonable suspicion standard after weighing visitors' privacy rights against legitimate interest in prison security).

■ In the instant case, it is undisputed that plaintiff and her son were not allowed to visit even after undergoing the extremely intrusive searches at issue in which no contraband was discovered. Since defendants apparently had no intention of allowing them to visit, they posed no threat to prison security. Consequently, the search was not justified by legitimate security concerns. Rather, it was no more than a search for evidence in a criminal investigation and could not be

validly conducted without a warrant based on probable cause. *See Marriott v. Smith,* 931 F.2d 517, 521 (8th Cir.1991) (no qualified immunity where prison officials searched visitor who was leaving the prison and thus could not have been bringing contraband into the prison at that time).

### C. *Exigent Circumstances*

■ Defendants also contend that the search was justified by exigent circumstances. The court rejects this contention as frivolous. The fact that defendants actually obtained a search warrant tends to negate their argument that due to exigent circumstances, they did not have time to prepare a proper affidavit in support of the warrant. Further, they obtained the warrant the day before the search. Thus, they had a full day in which to obtain a valid warrant. The only excuse advanced by defendants is that Judge Jensen was in his office only during the morning hours. However, defendants presumably could have obtained a search warrant from a different judge or from Judge Jensen at a location away from his office. The fact that obtaining a warrant might be inconvenient does not provide a reason to bypass the warrant requirement. *Johnson v. United States,* 333 U.S. 10, 15, 68 S.Ct. 367, 369–70, 92 L.Ed. 436 (1948). Further, the exigent circumstances exception requires probable cause which was not present here. Accordingly, the exigent circumstances exception to the warrant requirement does not apply.

### D. *Consent*

■ Defendants argue that even if the warrant was invalid, the search was legal because plaintiff consented. This argument is without merit. The Supreme Court has held that "[a] search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid." *Bumper v. North Carolina,* 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

### IV. CONCLUSION

A reasonably well-trained officer would have known that the search of plaintiff and

her son was not lawful. *See Malley,* 475 U.S. at 345, 106 S.Ct. at 1098. Thus, defendants are not entitled to qualified immunity for the violation of their Fourth Amendment rights. No genuine issue of material fact exists and plaintiff is entitled to judgment as a matter of law. Accordingly,

IT IS HEREBY ORDERED that defendants' motion for summary judgment is denied and plaintiff's motion for summary judgment is granted.